IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-295
No. COA20-497

Filed 6 July 2021

Mecklenburg County, No. 19-CVS-3344

CHRISTOPHER BARROW, Plaintiff,

v.

DAVID SARGENT, Defendant.

Appeal by Plaintiff from judgment entered 2 March 2020 by Judge Martin B. McGee in Mecklenburg County Superior Court. Heard in the Court of Appeals 28 April 2021.

*Johnson & Groninger, PLLC, by Ann Groninger and Helen S. Baddour, for Plaintiff-Appellant.*

*Robinson Elliot & Smith, by William C. Robinson and Dorothy M. Gooding, for Defendant-Appellee.*

COLLINS, Judge.

¶ 1    Plaintiff Christopher Barrow appeals from a judgment entered upon a jury's verdict finding that Plaintiff was not injured by the negligence of Defendant. Plaintiff argues that the trial court erred by declining to give either of two alternative proposed jury instructions and by requiring Plaintiff to introduce additional portions of Defendant's deposition at trial for completeness under N.C. Gen. Stat. § 1A-1, Rule 32(a)(5). The trial court did not err in declining Plaintiff's first proposed special

instruction because it was not a correct statement of law, and did not err in declining his alternative proposed instruction because it was not supported by the evidence. The trial court did not abuse its discretion in requiring the reading of the portions of Defendant's deposition requested by Defendant.

## I.    Procedural History and Factual Background

¶ 2        This case arises from a collision between a car driven by Defendant and a bicycle ridden by Plaintiff in the crosswalk across Meta Road adjacent to the intersection of Meta Road and Jetton Road in Cornelius.  The particular facts relevant to the issues on appeal are as follows:  A sidewalk runs alongside Jetton Road and crosses Meta Road in a marked crosswalk (the "crosswalk").  Drivers traveling toward Jetton Road on Meta Road approaching the intersection are presented with a stop sign before the crosswalk.

¶ 3        On 22 December 2016, Plaintiff was bicycling with a friend on the sidewalk along Jetton Road.  At around 4 p.m., Defendant was driving on Meta Road towards the intersection, planning to make a right turn onto Jetton Road.  In his deposition, Defendant testified that as he "approached the intersection, [he] saw that there was no one, no pedestrians that [he] could see in [his] clear view" and he shifted his attention left to look for oncoming traffic.  Similarly, Defendant told a responding officer that while he was pulling up to the stop sign, he looked in both directions "while he was also braking into it and didn't see anything" and "then at some point,

he was looking left with the traffic." Defendant testified that he came to a complete stop at the stop sign. Plaintiff testified that it "looked like [Defendant] was coming to a stop" but could not "say if he did a rolling stop or a full stop."

¶ 4 Plaintiff approached the crosswalk on the sidewalk from Defendant's right. Plaintiff entered the crosswalk, and the front bumper of Defendant's car collided with Plaintiff and his bicycle in the crosswalk. Plaintiff went to urgent care and was treated for injuries.

¶ 5 Plaintiff filed this negligence action against Defendant and Janet Sargent on 19 February 2019. Before trial, Plaintiff voluntarily dismissed certain claims and dismissed Janet Sargent as a party. At trial, Plaintiff read various portions of Defendant's deposition to the jury. Over Plaintiff's objection, the trial court required Plaintiff to read additional portions of the deposition to the jury for completeness under N.C. Gen. Stat. § 1A-1, Rule 32(a)(5).

¶ 6 At the charge conference, Plaintiff requested the trial court give either a special instruction explaining a "[m]otorists['] duty toward a lawful crosswalk user" or an instruction stating the definition of a highway and that "a sidewalk is a part of the highway." The trial court declined to give either instruction. Following the jury instructions given, Plaintiff renewed his request for an instruction on the definition of a highway, which the trial court again rejected.

¶ 7 After deliberations, the jury returned a verdict that Plaintiff was not injured

by the negligence of Defendant. The trial court entered judgment upon the jury's verdict, and Plaintiff gave timely notice of appeal.

## II.    Discussion

### A. Plaintiff's Proposed Jury Instructions

Plaintiff argues that the trial court erred by declining to give either of his proposed jury instructions.

> To prevail on this issue, [P]laintiff must demonstrate that (1) the requested instruction was a correct statement of law and (2) was supported by the evidence, and that (3) the instruction given, considered in its entirety, failed to encompass the substance of the law requested and (4) such failure likely misled the jury.

*Liborio v. King*, 150 N.C. App. 531, 534, 564 S.E.2d 272, 274 (2002). To be supported by the evidence, a proposed instruction "must be based on evidence, which when viewed in the light most favorable to the proponent, will support a reasonable inference of each essential element of the claim or defense asserted." *Anderson v. Austin*, 115 N.C. App. 134, 136, 443 S.E.2d 737, 739 (1994).

Plaintiff first argues that the trial court erred by failing to instruct the jury according to his first proposed special instruction that "[w]hen a lawful crosswalk user is crossing a roadway within a marked crosswalk, the operator of any vehicle must yield the right of way to the lawful crosswalk user." Plaintiff contends that, under North Carolina law, "a motorist has a duty to yield to a person in [the]

crosswalk, regardless of whether the person is on foot, riding a bicycle, scooter or skate board, or is in a wheelchair, as long as the person is lawfully (ie. not prohibited from) using the crosswalk."

¶ 10      Whether Plaintiff's first proposed special instruction accurately states the law is a question of statutory interpretation reviewed de novo on appeal. *See Swauger v. Univ. of N.C. at Charlotte*, 259 N.C. App. 727, 728, 817 S.E.2d 434, 435 (2018) ("Issues of statutory interpretation are also subject to de novo review."). "The primary objective of statutory interpretation is to ascertain and effectuate the intent of the legislature." *Lunsford v. Mills*, 367 N.C. 618, 623, 766 S.E.2d 297, 301 (2014) (citation omitted). "If the language of the statute is clear and is not ambiguous, we must conclude that the legislature intended the statute to be implemented according to the plain meaning of its terms." *Id.* (citation omitted).

¶ 11      The language of the statutory provisions governing this question is not ambiguous, and the plain meaning of those provisions does not support Plaintiff's first proposed special instruction. N.C. Gen. Stat. § 20-155 provides, in pertinent part:

> The driver of any vehicle upon a highway within a business or residence district shall yield the right-of-way to a *pedestrian* crossing such highway within any clearly marked crosswalk . . . except at intersections where the movement of traffic is being regulated by traffic officers or traffic direction devices.

N.C. Gen. Stat. § 20-155(c) (2016) (emphasis added). N.C. Gen. Stat. § 20-173 provides, in pertinent part:

> Where traffic-control signals are not in place or in operation the driver of a vehicle shall yield the right-of-way, slowing down or stopping if need be to so yield, to a *pedestrian* crossing the roadway within any marked crosswalk or within any unmarked crosswalk at or near an intersection, except as otherwise provided . . . .

N.C. Gen. Stat. § 20-173(a) (2016) (emphasis added).

¶ 12    These provisions, which Plaintiff cites in support of his first proposed special instruction, are by their terms limited to "pedestrians." The term pedestrian is not specifically defined in the relevant statutes. Absent a specific "contextual definition, courts may look to dictionaries to determine the ordinary meaning of words within a statute." *Dickson v. Rucho*, 366 N.C. 332, 342, 737 S.E.2d 362, 370 (2013) (quoting *Perkins v. Ark. Trucking Servs.*, 351 N.C. 634, 638, 528 S.E.2d 902, 904 (2000)). The ordinary meaning of pedestrian has long been understood to be a person traveling on foot, not a person bicycling. *See Pedestrian*, Webster's Third New International Dictionary (1971) (defining a pedestrian as "a person who travels on foot," or "one walking as distinguished from one traveling by car or cycle"). Indeed, our courts have consistently employed this definition of the term pedestrian. *See, e.g., Barnes v. Horney*, 247 N.C. 495, 498, 101 S.E.2d 315, 317 (1958) ("[A] pedestrian is a foot traveler . . . ."); *Lewis v. Watson*, 229 N.C. 20, 26, 47 S.E.2d 484, 488 (1948) ("[A]

person walking along a public highway pushing a handcart is a pedestrian . . . ."); *Holmes v. Blue Bird Cab, Inc.*, 227 N.C. 581, 584, 43 S.E.2d 71, 73 (1947) (holding that a person pushing a bicycle on foot was a pedestrian).

¶ 13      Other related provisions distinguish between pedestrians and bicyclists, confirming that the legislature intended to employ the ordinary meaning of the term pedestrian and did not intend to include bicyclists within the definition of pedestrian in sections 20-155(c) and 20-173(a).   *See* N.C. Gen. Stat. §§ 20-171.8(2) (2016) (defining an "operator" of a bicycle as "a person who travels on a bicycle"); 20-171.8(6) (defining a "public bicycle path" as certain rights-of-way "for use primarily by bicycles and pedestrians"); 20-173(c) (requiring the driver of a vehicle to yield the right-of-way to "any pedestrian, or person riding a bicycle," in certain circumstances); 20-175.6(c) (2016) (requiring a "person operating an electric personal assistive mobility device on a sidewalk, roadway, or bicycle path" to "yield the right-of-way to pedestrians and other human-powered devices").   Likewise, provisions governing pedestrians recognize that pedestrians "walk."   *See* N.C. Gen. Stat. §§ 20-172(b) (2016) (Pedestrian-control signals shall indicate either "WALK" or "DON'T WALK"); 20-174(d) (2016) ("Where sidewalks are provided, it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway.  Where sidewalks are not provided, any pedestrian walking along and upon a highway shall, when practicable, walk only on the extreme left of the roadway or its shoulder facing traffic which may

approach from the opposite direction.").

¶ 14        Additionally, bicycles are explicitly classified as "vehicles," not "pedestrians."

N.C. Gen. Stat. § 20-4.01 defines a "vehicle" as follows:

> Every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, excepting devices moved by human power or used exclusively upon fixed rails or tracks; provided, that *for the purposes of this Chapter bicycles and electric assisted bicycles shall be deemed vehicles* and every rider of a bicycle or an electric assisted bicycle upon a highway shall be subject to the provisions of this Chapter applicable to the driver of a vehicle except those which by their nature can have no application.

N.C. Gen. Stat. § 20-4.01(49) (2016) (emphasis added).

¶ 15        Because Plaintiff's first proposed special instruction was not a correct statement of law, the trial court did not err in declining to give the instruction to the jury. *See Liborio,* 150 N.C. App. at 534, 564 S.E.2d at 274.

¶ 16        This is not to say that bicyclists are wholly unprotected in crosswalks. "The law imposes upon every person who enters upon an active course of conduct the positive duty to use ordinary care to protect others from harm and a violation of that duty is negligence." *Toone v. Adams*, 262 N.C. 403, 409, 137 S.E.2d 132, 136 (1964). Additionally, the law imposes a number of specific duties on drivers. Drivers must stop at stop signs. *See* N.C. Gen. Stat. § 20-158(b)(1) (2021) ("When a stop sign has been erected or installed at an intersection, it shall be unlawful for the driver of any

vehicle to fail to stop in obedience thereto . . . ."). Drivers must also "keep a reasonable and proper lookout in the operation of [their] motor vehicle[s;]" have "a duty not only to look, but to see what is there to be seen[;]" and "must keep such an outlook in the direction of travel as a reasonably prudent person would keep under the same or similar circumstances." *Sink v. Sumrell*, 41 N.C. App. 242, 246, 254 S.E.2d 665, 668-69 (1979); *see also* N.C.P.I.—MV 201.20 (2020) (same). Additionally, a driver "upon a highway or public vehicular area before starting, stopping or turning from a direct line shall first see that such movement can be made in safety . . . ." N.C. Gen. Stat. § 20-154(a) (2021). In this case, the trial court instructed the jury on each of these duties.

¶ 17 Plaintiff presents several policy arguments that the specific protections our statutes afford to pedestrians using crosswalks should extend to bicyclists. "It is our duty to interpret and apply the law as it is written, but it is the function and prerogative of the Legislature to make the law." *State v. Scoggin*, 236 N.C. 19, 23, 72 S.E.2d 54, 57 (1952). Accordingly, we do not address the merits of Plaintiff's policy arguments, which are more appropriately directed to our legislature.

¶ 18 Plaintiff next argues that the trial court erred by declining his alternative proposed instruction that the definition of "highway" is "[t]he entire width between property or right-of-way lines of every way or place of whatever nature, when any part thereof is open to the use of the public as a matter of right for the purposes of

vehicular traffic" and that "[a] sidewalk is a part of the highway."

¶ 19        A "highway" is defined as

> [t]he entire width between property or right-of-way lines of
> every way or place of whatever nature, when any part
> thereof is open to the use of the public as a matter of right
> for the purposes of vehicular traffic.  The terms "highway"
> and "street" and their cognates are synonymous.

N.C. Gen. Stat. § 20-4.01(13) (2016).  A sidewalk is not categorically part of the

highway; but a sidewalk that falls within the boundaries of the property or right-of-

way lines described in section 20-4.01(13) would be a part of the highway.  Our

Supreme Court has held that the portion of sidewalk which drivers cross to access a

parking lot open to public vehicular traffic is considered a part of the "highway" under

the definition now codified in section 20-4.01(13).  *See State v. Perry*, 230 N.C. 361,

363, 53 S.E.2d 288, 289 (1949).

¶ 20        In the present case, Plaintiff has failed to present "evidence, which when

viewed in the light most favorable to [Plaintiff], will support a reasonable inference"

that the particular sidewalk along Jetton Road upon which he was riding his bicycle

was a part of the highway.  *See Anderson*, 115 N.C. App. at 136, 443 S.E.2d at 739.

There is no evidence in the record that the sidewalk at issue was "between property

or right-of-way lines of" the property upon which Jetton Road was located.  *See* N.C.

Gen. Stat. § 20-4.01(13).  Nor was there evidence that the sidewalk at issue was

crossed by drivers to access a parking lot open to the public for vehicular traffic.  *See*

*Perry*, 230 N.C. at 363, 53 S.E.2d at 289. While the evidence shows that the crosswalk is within the "roadway" of Meta Road and is therefore a part of the "highway," *see* N.C. Gen. Stat. § 20-4.01(38) (defining "roadway" as the "portion of a highway improved, designed, or ordinarily used for vehicular travel . . . ."), Plaintiff requested that the jury be instructed more broadly that "a sidewalk is a part of the highway." Plaintiff has therefore failed to demonstrate that his alternative proposed instruction "was supported by the evidence," *see Liborio*, 150 N.C. App. 534, 564 S.E.2d 274, and the trial court did not err by declining to give the instruction.

**B. Admission of Supplemental Deposition Excerpts**

Plaintiff next argues that the trial court erred by requiring the reading of additional portions of Defendant's deposition at trial to supplement the portions of the deposition introduced by Plaintiff.

At trial, "any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition . . . ." N.C. Gen. Stat. § 1A-1, Rule 32(a) (2016). "North Carolina law provides that a trial court may require a party to read a complete statement or other relevant portions of evidence in order to provide context for the jury; however, this decision is within the trial court's discretion at trial." *Gray v. Allen*, 197 N.C. App. 349, 358, 677 S.E.2d 862, 868 (2009) (citing N.C. Gen. Stat. § 1A-1, Rule 32(a)(5)).

"[W]here matters are left to the discretion of the trial court, appellate review is limited to a determination of whether there was a clear abuse of discretion." *White v. White,* 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985). "A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *Id.*

¶ 23        Plaintiff read the following portions of Defendant's deposition at trial, and the trial court required the italicized portions to be read for completeness.

> Q. Now, as of December . . . 2016, how long had you lived in that neighborhood?
>
> A. I had lived there my whole life, so since 1994.
>
> Q. Okay.  Would you say that you came in and out of the neighborhood at least once a day, sometimes more than once a day while you were living there?
>
> A.  Yes.  I wasn't driving until I was 16, obviously.
>
> Q. Okay.
>
> A. But yes, at least once a day.  If I left the house, more than likely I was going to . . . [g]o through that intersection.
>
> Q. Okay.  How would you describe your neighborhood?  Is it a family neighborhood?  Do you see a lot of kids and activity in the neighborhood?
>
> A. Yes.  It's a pretty active neighborhood.
>
> Q. Okay.  All residential area?
>
> A. Yes.  Yeah.  There's no, like, shopping centers or retail

or anything . . . like that.  Just residential and a golf club?

*Q. Okay.  Did you get your driver's license when you were 16?*

*A. I did.*

*Q. How old were you at the time that this happened?*

. . . .

*A. 22.*

. . . .

Q. You said it's a pretty active neighborhood. What was your experience of seeing people on the sidewalks walking, riding bikes, jogging, what have you?

A. Generally, I remember people doing all of those things, nothing specifically.

Q. Right.  Just a general memory of seeing a lot of activity?

A. Yes.

. . . .

*Q. Let's turn to the December 22 collision.  All right.  In your own words tell me what happened?*

*A. As we said, I was driving my car to play golf.  I left my house and . . . went up Meta Road, and approached the intersection of Meta Road and Jetton to make a right to go towards the golf course.  As I approached the intersection, I saw that there was no one, no pedestrians that I could see in my clear view.  I shifted my attention left to look for oncoming traffic, and I - - I don't remember specifically how many cars, but I - - I do seem to remember waiting for traffic to go by.  And then, as I saw that the traffic from the left was clear, I turned my attention to look where I was going,*

*let off the brakes to start moving, and right as I shifted my attention to the right, I saw [Plaintiff] in front of me on the bicycle. I saw him before I made contact, but given the, the shock and reaction time of it, I did bump into him. We - - there was a period of time before I was able to, like, fully stop the car that he was kind of pinned up against the front of my car. And then, once I was able to stop, he fell away from the car. Once I - - once that happened, I got up the car, got out and checked out [Plaintiff] and how he was doing and made sure we got him out of the road.*

*. . . .*

*Q. You weren't rushing your speed or anything?*

*. . . .*

*A. No.*

*Q. And did you come to a complete stop at the stop sign? It sounds like you did.*

*A. I did, because I do distinctly remember stopping and looking because I had to definitely make sure the traffic wasn't coming left. And there was - - I don't remember exactly how many cars, but there - - I do distinctly remember having to wait for traffic coming from this part of Jetton Road.*

*Q. From your left as you are facing . . . Jetton Road from Meta?*

*A. Correct.*

*Q. Okay. And I know you said you don't remember how many cars, but it didn't seem like it was, you know, more than one, maybe a couple of cars or - -*

*A. I - - I can't remember exactly. It was - - it was at least one. . . . I don't remember how many it was.*

*Q. But that there was traffic.*

*. . . .*

*A. But that there was traffic.*

*Q. Okay. And in general, what was the traffic like that day? And were cars coming from the other direction?*

*A. There - - there were some cars coming from the other direction. It definitely wasn't empty streets. I would say pretty steady, normal traffic for this residential area.*

*. . . .*

*Q. As you are driving along Meta and you are approaching the stop sign at Jetton, are there any obstructions and signs in the way of you being able to see the sidewalk on either side of the road?*

*A. There are. So . . . as I was [] approaching that intersection on the near right corner, there is kind of an elevated - - not a hill, but . . . an elevated grounds area where they have just plants and shrubbery on it, so it's a - - can be a bit tough to see a pedestrian[] coming from that way. There is a . . . kind of a middle median just at the intersection of Meta here, kind of a little spot in the middle between the incoming people of Meta and outcoming people of Meta that you kind of have to pull out in front of a bit to be able to see cars coming from the left. . . . And just generally, it's a downhill area of the road coming from this side . . . this side over here kind of comes over a rise and then starts to go downhill pretty much everywhere, I would say. . . . Generally, around this intersection, it's downhill going this way on Jetton.*

*Q. . . . [T]ell me if I'm understanding it correctly. As you're approaching the stop sign on Meta and you're looking to the right, you have a little bit of a limited sight distance because Jetton Road itself is a downhill road, so you can only see for*

*some distance to the right; is that correct?*

*A. Correct.*

*Q. And is it the same as true for the left, or was there more visibility there?*

*A. The left is a little bit, definitely more visibility, I would say, because also the road kind of starts to go move the right here. If you were going out towards Cornelius or Jetton, the road kind of starts moving to the right, so you actually can then maybe see a little bit more than you can normally.*

*Q. Okay. How far back . . . can you start seeing out onto the road? . . . As you are approaching the stop sign, you're probably already kind of looking at traffic on Jetton; is that right?*

*A. Once I get to the stop, to the intersection, yes.*

*. . . .*

*Q. Okay. . . .*

*A. Because you can't see it initially very much because of that kind of middle tree, shrubbery area.*

*Q. I see. Okay. So you actually have to be at the stop sign to really get - -*

*A. You do.*

*Q. - - the view that you need in order to safely pull out.*

*A. You do for both directions.*

*Q. Okay. So do you know how long in seconds or minutes . . . you were at the stop sign before you started to pull out?*

*A. I don't remember the exact amount of time it was. I had stopped and was looking at traffic to the left. It was - - it*

*was multiple seconds, I would say. I don't remember exactly details beyond that, but it was, you know, certainly more than a second that I was stopped there.*

*Q. Okay. All right. And as you are approaching the stop sign, before you got to the stop sign, is it true that you did not see [Plaintiff] or anyone on a bicycle?*

*A. I did not see anyone, at least at the corner, and really, the corner is kind of the only place that I can really see as I was approaching. . . . [t]he intersection, because of that kind of raised hill, plants that are on this near corner of Meta and Jetton.*

*Q. Okay. If I understand what you told me earlier correctly you actually did not see him until you started to go out from the stop sign that way?*

*A. Yeah. I - - I would say I saw that the coast was going to be clear on the left. I started to look to the right. As I lift my foot off the brake, so my car started moving slowly, and then as I then panned right, that's when I saw [Plaintiff].*

Q. Okay. Before you pulled out from the stop sign, before you took your foot off the gas and started to move forward, did you look right at any time?

A. I don't think I did. I would say it happened as I was just letting my foot off the brake to start moving. As I - - as when I started to look to the right.

*Q. Okay. And how fast did you have to pull out? I mean, was there other traffic coming from the left? I mean, can you describe how fast you pulled out?*

*A. I definitely wasn't trying to hit a gap. It wasn't like I needed to pull out quickly. I - - from what I remember, it was totally clear from the left, so I had as much time as I wanted to, to turn right, in terms of the traffic coming from the left. And so it was, you know, letting my foot off the*

*brake. And I would say, yeah, it was just kind of that idling speed that I was starting to move at.*

Q. Okay. And what part of your car was impacted in the collision?

A. Just the front. . . . It is just basically right on the front of my car, the front bumper, the front area of my car.

[Defendant marks the front bumper of the car on the exhibit]

Q. Okay. So there are some marks - -

A. Some lower, lower front, lower front part of my car.

Q. Okay. And there - - so there's some scratches that were left on the car, and those are from that impact?

A. Yes.

. . . .

*Q. Do you know how much time went by from the time you pulled out from the stop sign until the impact?*

*A. I don't. . . . And I don't have an exact, exact amount of time. It was - - it was a relatively short time because it was basically I took my foot off the brake as I was looking to the right, and then he was there. And that's basically when the impact happened.*

¶ 24    The trial court reasoned that Defendants' requested portions were relevant to those introduced by Plaintiff because they further explained (1) Defendant's familiarity with the neighborhood, (2) what Defendant did at the time of the collision, and (3) what Defendant saw and what conditions were like at the time of the collision. We cannot say that the trial court's decision on these grounds was "so arbitrary that

it could not have been the result of a reasoned decision." *See White*, 312 N.C. at 777, 324 S.E.2d at 833. Accordingly, the trial court did not abuse its discretion by requiring the reading of the portions of Defendants' deposition requested by Defendant.

### III. Conclusion

The trial court did not err in refusing Plaintiff's first proposed special jury instruction concerning "lawful crosswalk users" because it was not a correct statement of law. The trial court did not err in refusing Plaintiff's alternative proposed instruction on the definition of the highway and of a sidewalk being a part of the highway because it was unsupported by the evidence. The trial court did not abuse its discretion in requiring Plaintiff to supplement the portions of Defendants' deposition read at trial with additional portions requested by Defendant.

AFFIRMED.

Judges DIETZ and JACKSON concur.